UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TY PUTRICH,

     Plaintiff,

                                 Case No. 1:21-cv-957

v.

                                 Hon. Hala Y. Jarbou

MARK PETERSON, et al.,

     Defendants.

_____/

## **OPINION**

Plaintiff Ty Putrich brings this civil rights action asserting claims under 42 U.S.C. § 1983. Plaintiff alleges that Defendant Officer Mark Petersen[1] violated his Fourth Amendment rights to be free from arrest without probable cause, unreasonable search and seizure, and excessive force.[2] Before the Court is Defendant's motion for summary judgment (ECF No. 27) as well as Plaintiff's motion for summary judgment (ECF No. 39).  For the reasons stated below, the Court will grant in part and deny in part both of the parties' respective motions.

### **I. FACTUAL BACKGROUND**

Plaintiff works in the automotive industry as a consultant.  (Putrich Dep. 9-11, ECF No. 40-11.)[3]  In 2014, Plaintiff moved to Vicksburg, Michigan, to live with his girlfriend, Gina

---

[1] Plaintiff's complaint spells Defendant's last name as "Peterson."  (*See* Compl., ECF No. 1.)  However, the police report and deposition testimony indicate that Defendant's last name is spelled "Petersen."  The Court adopts the latter spelling.

[2] Plaintiff's complaint also names Officer Derek Guthrie as a defendant.  (*See* Compl.)  However, Officer Guthrie was dismissed from the case pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.  (2/17/2022 Order, ECF No. 10.)

[3] Excerpts of Plaintiff's deposition can also be found at ECF Nos. 28-1, 43-2 and 44-2.

Szpak.  (*Id.* at 13.)  Szpak worked as a licensed esthetician.  (Szpak Dep. 8-9, ECF No. 40-12.)[4]
In 2013, Szpak incorporated a skin care business, Armonia Aesthetics, Inc., for which she was the
sole shareholder and officer.  (Armonia Aesthetics Filing, ECF No. 28-2.)  Armonia Aesthetics
had 60,000 common shares authorized.  (*Id.*, PageID.103.)  After moving to Michigan, Plaintiff
and Szpak developed a cannabis business through the corporation.  (Putrich Dep. 15.)  Plaintiff
also routed the profits from his automotive consulting business to the corporation.  (*Id.*)  In 2016,
Szpak sold 50% of Armonia Aesthetics's authorized shares to Plaintiff.  (2016 Share Purchase
Agreement, ECF No. 28-3.)  However, Szpak remained listed as the president, treasurer, secretary,
and director of Armonia Aesthetics.  (2017 LARA Filings, ECF No. 28-4.)

On December 18, 2018, Szpak purchased a Ford F-150 truck in her name.  (Vehicle Title,
ECF No. 28-6.)  To finance she truck, she used $10,000 from Armonia Aesthetics and took out a
$15,000 loan.  (Putrich Aff., ECF No. 40-8, PageID.646; Szpak Aff., ECF No. 40-9, PageID.649.)

On December 21, 2018, Plaintiff and Szpak got into an argument over the truck.  Plaintiff
wanted the truck in Armonia Aesthetics's name for a tax deduction.  (Putrich Dep. 27.)  Plaintiff
asked Szpak to sign the truck over to the corporation and to give him all the money in Armonia
Aesthetics's account, which she refused to do.  (Szpak Aff., PageID.650.)  Plaintiff further asked
Szpak for money to pay off the loan, and Szpak gave him a check for $15,000.  (Putrich Aff.,
PageID.647.)  After a period of arguing, Heidi Boomsma—Szpak's cousin who was also living at
the home—asked Szpak if she should call the police, and Szpak said yes.  (Szpak Aff., PageID.650;
Szpak Dep. 18, 24.)

Officers Mark Petersen, Derek Guthrie, and Joseph Geiser were dispatched to the home on
a "trouble with a subject" complaint.  (Police Rep., ECF No. 28-8, PageID.145.)  The officers

---

[4] Excerpts of Szpak's deposition can also be found at ECF Nos. 28-5 and 44-3.

spoke with both Plaintiff and Szpak multiple times.  Defendant testified that there were "numerous back-and-forths," meaning the officers alternated between speaking to Plaintiff, who was outside, and Szpak, who was inside.  (Petersen Dep. 39, ECF No. 40-13.)[5]  Szpak similarly indicated that the officers "were in and out" so she "do[esn't] remember the time frame on any of that frankly." (Szpak Dep. 28.)  The deposition testimony and video evidence do not provide a clear timeline of what was said when.  Accordingly, the Court will describe what Plaintiff and Szpak said to the officers cumulatively.

Szpak indicated that she purchased the truck for Armonia Aesthetics but put it in her name. (Petersen Dep. 33; Szpak Dep. at 27.)  She provided documentation demonstrating that she was the sole officer of Armonia Aesthetics and that the truck was registered in her name.  (Petersen Dep. 42-44; Police Rep., PageID.145.)  She said that Plaintiff accused her of embezzling money from Armonia Aesthetics.  (Petersen Dep. 33.)

Plaintiff also told the officers that he believed Szpak had embezzled money to purchase the truck and that he wanted Szpak charged for embezzlement and for filing a false police report.  (*Id.* at 37-38; Petersen Dash Camera 50:50-50:57, ECF No. 44-5.)[6]  Plaintiff, who appeared agitated, stated that he "want[ed] the officers to arrest [him]" and to be "charged with a felony" for stealing the vehicle.  (Petersen Dash Camera 48:26-50:06.)  Plaintiff said he possessed the keys to the truck, had possessions in the truck, and intended to take it to his mother's home in Canton, Illinois.  (*Id.* at 38; Putrich Dep. 31.)  Defendant told Plaintiff that this was a civil matter between himself and Szpak.  (Petersen Dep. 46.)

---

[5] Excerpts of Defendant's deposition can also be found at ECF Nos. 28-9, 43-1, and 44-1.

[6] Both Defendant and Officer Guthrie's dash camera footage can be found at ECF No. 44-5.

The officers told Plaintiff that he could not take the truck because it was Szpak's vehicle "and she wanted it back." (Petersen Dep. 46.) Plaintiff testified that he was "forcibly removed from the truck." (Putrich Dep. 32.)[7] Defendant testified that Plaintiff walked towards the driver's side door and he, along with Officer Guthrie, grabbed Plaintiff's elbows to prevent his entry into the truck. (Petersen Dep. 47-48.)

The officers then informed Plaintiff that they were going to detain him for safety reasons. (*Id.* at 48.) Defendant proceeded to handcuff Plaintiff, who did not resist. (*Id.* at 49.) Defendant then patted Plaintiff down, searched his pockets, and removed Plaintiff's cell phone, some cash, and his wallet. (*Id.* at 51.) Defendant could not recall whether Plaintiff had a pocket knife; however, Plaintiff testified that he did not have a pocket knife at the time. (*Id.* at 50; Putrich Aff., PageID.648.) Defendant then placed Plaintiff in the backseat of his patrol car. (Petersen Dep. 53.)

Defendant stood near the patrol car while Officers Guthrie and Geiser provided Szpak with the keys to the truck[8] and instructed her to remove Plaintiff's belongings from the truck and place them on the hood or trunk of Plaintiff's car, a Toyota Avalon that was also parked at the residence. (Guthrie Dash Camera 3:25-3:35.)

Plaintiff, who was still detained, then stood up outside of the patrol car. (*Id.* at 4:28-4:31.) Defendant instructed Officer Guthrie to go to the driver's side passenger door, reach inside, grab ahold of Plaintiff's handcuffs, and assist him in pulling Plaintiff into the patrol car. (Petersen Dep. 63.) Accordingly, Officer Guthrie jogged to the left-side of the car, opened the passenger door, and got inside. (*Id.* at 4:32-4:35.) Defendant first placed one hand on top of Plaintiff's head to push him down into the patrol car. (*Id.* at 4:37-4:39.) Defendant then placed both hands around

---

[7] Plaintiff's brief on summary judgment, however, relies on Defendant's testimony that Plaintiff was grabbed by the elbows and prevented from entering the truck. (*See* Pl.'s Br. in Supp. of Mot. for Summ. J., ECF No. 40, PageID.465.)

[8] Defendant testified that he does not remember how the keys to the truck were acquired. (Petersen Dep. 52.)

Plaintiff's head and first pulled Plaintiff towards him and then pushed him down into the patrol car.  (*Id.* at 4:40-4:43.)  Whether Plaintiff did a summersault in the car is disputed, and the rear camera in the patrol car was malfunctioning at the time.  (Petersen Dep. 67.)

From inside the car Plaintiff exclaimed: "Oh my god! . . . My neck! . . . I need help! . . . Get me an ambulance immediately! . . . I can't fucking believe you did that!"  (Guthrie Dash Camera 4:40-5:15.)  Defendant first called his supervisor, Sergeant Stanfull, who advised him to call for an ambulance, which Defendant subsequently did.  (Petersen Dep. 71-72.)   In the approximately four or five minutes before Defendant called for an ambulance, Officer Geiser "held C-spine" on Plaintiff, meaning he held his head and neck in place.  (*Id.* at 70.)

Plaintiff was taken by ambulance to Bronson Hospital in Kalamazoo, Michigan.  (Police Rep., PageID.157-160 (hospital discharge paperwork attachment).)  Officer Geiser rode in the ambulance with him, and Defendant followed in his patrol car.  (Petersen Dep. 75.)  Plaintiff was diagnosed with neck pain and instructed to take Motrin or Tylenol as needed.  (Police Rep., PageID.157.)  Once discharged, Defendant took Plaintiff to the Kalamazoo County Jail where he was charged with resisting and obstructing a police officer.  (*Id.*, PageID.144.)

After the foregoing events, Szpak advised Defendant that she would be concerned for her safety when Plaintiff was released from jail because she feared he would retaliate against her.  (Police Rep., PageID.148.)  She also indicated that approximately one year prior, Plaintiff had pinned her down to the ground, but she did not report this instance of domestic violence.  (*Id.*; Szpak Dep. 36-37.)

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.*  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"This standard of review remains the same for reviewing cross-motions for summary judgment."  *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

### B. Qualified Immunity

"Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights."  *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)).  Officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *Id.*  This legal principle must "clearly prohibit the officer's conduct in

the particular circumstances before him." *Id.* at 590.  Accordingly, "[t]he relevant, dispositive inquiry" under the clearly established prong is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

"[C]ourts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The plaintiff bears the burden of showing that an officer is not entitled to qualified immunity.  *See LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016).  "When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately.  [And] the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).

### III. ANALYSIS

#### A. Merits

##### 1. Unlawful Seizure

At issue are two types of seizures protected by the Fourth Amendment: seizure of property and seizure of person.  The Court will address each seizure separately.

###### (a) Seizure of Property

Under the Fourth Amendment, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Plaintiff points to *Cochran v. Gilliam*, 656 F.3d 300 (6th Cir. 2011), *Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012), and *Middaugh v. City of Three*

*Rivers*, 684 F. App'x 522 (6th Cir. 2017) to support his argument that an unlawful seizure of property occurred in this case.

The aforementioned cases concern "what level of police involvement transforms an otherwise private act of repossession into state action for constitutional purposes." *Middaugh*, 684 F. App'x at 527 (citing *Hensley*, 693 F.3d at 689-91; *Cochran*, 656 F.3d 606-08). "Generally, 'officers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor.'" *Cochran*, 656 F.3d at 310 (quoting *Marcus v. McCollum*, 394 F.3d 813, 818-19 (10th Cir. 2004)). Here, Plaintiff argues that Defendant affirmatively intervened in a civil dispute to aid Szpak in repossessing the truck.

As an initial matter, Boomsma and Szpak did not call the police to supervise or assist them in repossessing the truck. In *Middaugh*, a plaintiff's sister-in-law requested that the officers escort her to the plaintiffs' home "because she was afraid that someone might try to prevent her from taking the Buick and that the situation might turn violent." *Middaugh*, 684 F. App'x at 525. In *Hensley*, the defendant—whose job it was to repossess collateral for lenders in the Ogemaw County, Michigan area—requested police assistance "because [the plaintiff's] conduct during a previous repossession resulted in an assault charge" and he "was concerned about potential violence." *Hensley*, 693 F.3d at 684. Here, Boomsma called the police in the midst of an argument between Plaintiff and Szpak concerning, among other things, taxes on and title to the truck. (Szpak Dep. 19.) Boomsma said Plaintiff "wo[uldn't] leave [Szpak] alone" and "was gettin' in her face." (Petersen Dash Camera 3:57-3:59.) Szpak testified that she wanted Boomsma to call the police because she felt "distraught" and "confused." (Szpak Dep. 24.) Plaintiff himself told the officers that this was "a criminal matter," as opposed to an act of repossession, because of Szpak's "theft" or "redirection of corporate funds" from Armonia Aesthetics. (Petersen Dash Camera 10:35-

8

10:50.)  It appears Plaintiff and Szpak were ending their relationship and arguing about how and when to sever pre-existing ties, including issues relating to the truck.  (*See id.* at 5:01-5:29 (Boomsma said, "you can't all of a sudden separate everything in two hours" and both Szpak and Boomsma appear to respond affirmatively when an officer asked if Szpak and Plaintiff were breaking up).)

Even if Boomsma and Szpak had called the police specifically requesting assistance in repossessing the truck, Plaintiff has not demonstrated that he legally possessed the truck.  In *Middaugh*, the individual attempting to repossess the property "had no legal claim to ownership" of a vehicle when she neither "claimed to have a court order awarding her possession of the Buick, nor did she claim to be a creditor entitled to use self-help to repossess the car under state law." *Middaugh*, 684 F. App'x at 529.  This individual also provided the defendant police officers with a "suspect" application for title because the document said that her spouse had given her the vehicle *and* that another individual had sold her the vehicle.  *Id.*  The Sixth Circuit found that the officers violated the plaintiff's Fourth Amendment rights by unreasonably taking an active role in a private repossession.  *See id.*

Similarly, here, Plaintiff had no legal claim to ownership of the truck.  There is a factual dispute as to whether Szpak gave Plaintiff permission to take the truck and later revoked it.  (*See* Szpak Dep. 28; Szpak Aff., PageID.649; Petersen Dep. 55.)  However, Szpak provided Defendant with documents that listed her as the sole title owner of the truck and the sole officer of Armonia Aesthetics, the entity that Plaintiff wanted title transferred to.  Plaintiff had no legal claim to ownership, and Plaintiff cites no caselaw suggesting that a verbal permission to use, if it was even present here, would overcome legal title in a question of unlawful seizure.  Given the factual differences between *Cochran*, *Hensley*, and *Middaugh* and the facts of this case, the Court is not

persuaded by Plaintiff's argument. Accordingly, Defendant did not unlawfully seize Plaintiff's alleged property.

### (b) Seizure of Person

The officers initially detained Plaintiff and subsequently arrested him for resisting and obstructing a police officer. The Court will address the constitutionality of each seizure separately.

<u>Investigatory Detention</u>

An investigatory detention, also known as a *Terry* stop, is "a seizure that is subject to Fourth Amendment scrutiny." *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001). "[P]olice only need a reasonable suspicion of criminal activity to conduct a brief investigatory detention." *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000). "'Reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the person stopped of criminal activity.'" *Bey v. Falk*, 946 F.3d 304, 313 (6th Cir. 2019) (quoting *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005)).

Here, Defendant, Officer Guthrie, and Officer Geiser detained Plaintiff after he attempted to get into the truck. Plaintiff stated that he "want[ed] the officers to arrest [him]" and to be "charged with a felony" because "he [was] stealing this vehicle." (Petersen Dash Camera 48:26-50:06.) Plaintiff also wanted Szpak charged for filing a false police report and for embezzlement. (*See id.* at 50:50-50:57.) Immediately before being detained, Plaintiff reiterated his intention to "tak[e] the vehicle." (*Id.* at 51:11-51:14.) Defendant "felt at that time that [Plaintiff] was going to get in the vehicle and cause something that would be unsafe like getting into a pursuit." (Petersen Dep. 45.) Defendant had reasonable suspicion to prevent Plaintiff from taking a truck that he had no legal title to and may or may not have had permission to use.

However, "[w]hen the nature of a seizure exceeds the bounds of a permissive investigatory stop, the detention may become an arrest that must be supported by probable cause." *Dorsey v.*

10

*Barber*, 517 F.3d 389, 398 (6th Cir. 2008) (citing *Smoak v. Hall*, 460 F.3d 768, 780-81 (6th Cir. 2006)). "[T]he fact that [Defendant] did not formally arrest [Plaintiff] does not resolve the issue of whether their detention amounted to an arrest requiring probable cause." *Gardenhire*, 205 F.3d at 314. "Yet, there is no litmus test for determining when the line is crossed. We consider such factors as the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion." *Dorsey*, 517 F.3d at 399 (citing *Smoak*, 460 F.3d at 781).

"'[T]he use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, [but] these displays of force must be warranted by the circumstances.' Intrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the others." *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015) (quoting *Smoak*, 460 F.3d at 781). Here, Plaintiff exhibited no signs that he was armed and dangerous or that he intended to evade the officers. Instead, Plaintiff actually wanted to be arrested and charged with a felony because he believed it would result in Szpak being charged with filing a false police report. Under these circumstances, handcuffing Plaintiff exceeded the bounds of an investigatory detention.

Courts also consider "[w]hether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Kowolonek v. Moore*, 463 F. App'x 531, 534 (6th Cir. 2012) (quoting *United States v. Smith*, 594 F.3d 530, 537 (6th Cir. 2010)). Plaintiff was detained for approximately twenty-three minutes in handcuffs in the backseat of a patrol car before Defendant said, "Now you're gonna rise to the level of resisting an officer . . . and now you're gonna be charged with a felony." (Petersen Dash Camera 51:22-1:14:59.) During this time, the officers

continued investigating the truck's ownership by speaking with Szpak.  However, the officers went beyond merely investigating when they ordered Szpak to remove Plaintiff's belongings from the truck and told him to leave the scene in his Toyota Avalon.  In sum, Plaintiff's detention amounted to an arrest that required probable cause.

There is a genuine dispute of material fact as to whether Defendant had probable cause to arrest Plaintiff for attempting to take the truck.  "An officer has probable cause to arrest a suspect when the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  "An objective, not a subjective, standard applies.  The question is whether the observable circumstances justify an arrest; the officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

A probable cause determination "must [also] take account of 'both the inculpatory *and* exculpatory evidence.'"  *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (quoting *Gardenhire*, 205 F.3d at 318 (emphasis in original)).  "Although precedent does not mandate that law enforcement operatives should conduct quasi-trials as a necessary predicate to arrest, an officer cannot simply turn a blind eye toward evidence favorable to the accused or ignore information which becomes available in the course of routine investigations."  *Id.* (internal citations and quotation marks omitted).

Here, Defendant knew that the truck was legally registered in Szpak's name.  However, there is a genuine dispute of material fact as to whether Szpak gave Plaintiff permission to take

the truck and later revoked this permission.  Szpak testified that she verbally told the officers to "let [Plaintiff] take the truck" because she "just wanted it done . . . just wanted it to stop."  (Szpak Dep. 28.)  Szpak denies ever revoking her consent and permission for Defendant to drive the truck. (*See* Szpak Aff., PageID.649.)  However, Defendant testified that, "[a]fter putting Mr. Putrich in the patrol car and talking with her again, I only recall her stating that she didn't want him driving the vehicle anymore."  (Petersen Dep. 55.)  Similarly, the police report states that before Plaintiff was detained, Szpak "advised that she allowed Putrich to drive the truck, but now she no longer wishes to allow him entry or use of the truck."  (Police Rep., PageID.146.)  If, at the time Plaintiff was handcuffed, searched, and placed in the patrol car, Defendant knew that Plaintiff had permission to take the truck, then Plaintiff would not be committing a criminal offense.  Such potential exculpatory evidence cannot be ignored in a probable cause determination.  Accordingly, there is a genuine dispute of material fact as to whether Defendant had probable cause to arrest Plaintiff for unlawfully taking the truck, or attempting to do so.

Arrest for Resisting and Obstructing an Officer

Plaintiff also disputes whether Defendant had probable cause to arrest him for resisting and obstructing a police officer.  "'A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.'"  *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)).  "[A] showing of probable cause provides a complete defense to a claim of false arrest . . . . State law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest."  *Woods v. Eubanks*, 25 F.4th 414, 421 (6th Cir. 2022) (internal citations and quotation marks omitted).

The elements of resisting or obstructing a police officer under Mich. Comp. Laws § 750.81d(1) are: "(1) the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered a police officer, and (2) the defendant knew or had reason to know that the person that the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered was a police officer performing his or her duties." *People v. Corr*, 788 N.W.2d 860, 863 (Mich. Ct. App. 2010) (citing Mich. Comp. Laws § 750.81(d); Mich. Comp. Laws § 750.81d(7)(b); *People v. Ventura*, 686 N.W.2d 748, 750 (Mich. Ct. App. 2004)).

Plaintiff's conduct constitutes obstruction.  "'Obstruct includes the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command.'" *Id.* (quoting Mich. Comp. Laws § 750.81d(7)(a)); *see also Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010) ("Indeed, in Michigan, one can be convicted under § 750.81d(1) simply for a 'knowing failure to comply with a lawful command." (citing Mich. Comp. Laws § 750.81d(7)(a)).  While Plaintiff was still in the backseat, Defendant repeatedly ordered him to "step back in the car" to which he replied, "Get another officer involved" and "I want out."  (Petersen Dash Camera 1:14:21-1:14:45.)  Defendant then said, "Now you're gonna rise to the level of resisting an officer . . . and now you're gonna be charged with a felony."  (*Id.* at 1:14:52-1:14:59.)  Plaintiff then stood up and got out of the patrol car.  (Guthrie Dash Camera 4:31-4:43.)[9]  Plaintiff both threatened to get out of the car and did get out of the car despite Defendant's verbal commands. Defendant had probable cause to believe that Plaintiff was resisting and obstructing a police

---

[9] Defendant's dash camera better captures the verbal exchange between Plaintiff and Defendant, while Officer Guthrie's dash camera better captures the physical encounter.  Both dash cameras have time stamps.  At 2:40:48 p.m., Defendant told Plaintiff to get back in the car, and Plaintiff replied stating that he wanted to get out.  Defendant told Plaintiff that his conduct would rise to the level of resisting and obstructing an officer at 2:41:19 p.m.  Defendant got out of the patrol car and stood up at 2:41:47 p.m.

officer.  Plaintiff's false arrest claim, as it relates to the resisting and obstructing charge, fails.
Defendant is entitled to summary judgment on this claim.

### 2. Unlawful Search

After preventing Plaintiff from entering the truck but before detaining him in the patrol car,
Defendant frisked and searched him.  The Fourth Amendment "permits precautionary searches for
weapons following a lawful *Terry* stop, known as *Terry* frisks, where there is 'reasonable suspicion
that the person searched may be armed and dangerous.'"  *United States v. McCallister*, 39 F.4th
368, 373 (6th Cir. 2022) (quoting *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016);
citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  In determining whether there was reasonable
suspicion to justify a *Terry* frisk, the court must "view the totality of the circumstances through an
objective lens" and ask "whether there was a moderate chance, arising from articulable facts and
inferences" that the individual was armed and dangerous.  *Id.*  Reasonable suspicion "'requires
more than a mere hunch.'"  *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014) (quoting
*United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2014)).

Defendant lacked reasonable suspicion to believe that Plaintiff was armed and dangerous.
Boomsma called the police in response to an argument between Plaintiff and Szpak.  However,
any suspicions of domestic violence were dispelled when Szpak told Defendant that there was no
domestic violence and that she did not fear for her safety.  (Szpak Dep. 24.)  Defendant neither
observed any injuries on Szpak nor heard a complaint that she had been assaulted or physically
touched in any way.  (Petersen Dep. 34.)[10]  Defendant testified that he detained Plaintiff because
he "felt at that time that [Plaintiff] was going to get in the vehicle and cause something that would

---

[10] Szpak informed Defendant that she was concerned for her safety upon Plaintiff's release from jail which was *after*
Plaintiff's frisk, not before.  Before the frisk, Szpak told Defendant that there were no domestic violence concerns.

be unsafe like getting into a pursuit."  (Petersen Dep. 45.)  In other words, that Plaintiff would take the truck and drive away.  However, as previously explained, Plaintiff said that he wanted to be arrested so that Szpak would be charged with filing a false police report.  If Plaintiff wanted to be arrested, then he would not flee from the officers.  None of the articulable facts at the time of the frisk suggest that Plaintiff could have been armed and dangerous or posed a threat to the officers, Szpak, or Boomsma.

Even if Defendant had reasonable suspicion to frisk Plaintiff, he exceeded the lawful bounds of a *Terry* frisk by reaching into Plaintiff's pocket.  "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry*." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).  Under the plain touch doctrine, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375.  In assessing whether an object's identity is readily apparent, the Court considers three factors:

> (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*Pacheco*, 841 F.3d at 395 (internal citations and quotation marks omitted).

Applying these factors, Defendant's seizure of Plaintiff's cell phone, cash, and wallet[11] were not necessary to determine if he was armed.  They have no connection to the potential theft of the truck and are not similar in shape to a weapon.  *See e.g.*, *King v. United States*, 917 F.3d

---

[11] The Court cannot discern whether the keys to the truck were seized from Plaintiff's pocket or from the truck itself before they were given to Szpak.  Even if they were seized from Plaintiff's pocket, Defendant had no legal justification to seize the other items—a phone, cash, and wallet.

409, 428 (6th Cir. 2019) (finding that a defendant officer's seizure of the plaintiff's wallet was unreasonable because it "looked like a wallet, felt like a wallet, and was located where one would expect to find a wallet.  And nothing related to the circumstances of the investigative stop or the crime that [the plaintiff] was suspected of committing created a reasonable suspicion that the wallet might be something other than what it immediately appeared to be"); *Gale v. O'Donohue*, 824 F. App'x 304, 319-20 (6th Cir. 2020) (finding that the plaintiff did not consent to being searched before an officer removed his wallet subsequent to a *Terry* frisk).

Defendant himself appeared to recognize the illegality of his search.  During an internal investigation of a complaint Plaintiff filed with the Vicksburg Police Department, investigator Kenneth Colby found that Defendant "conducted a complete search" of Plaintiff.  (Colby Investigation Rep., ECF No. 40-7, PageID.630.)  During the course of this investigation, Defendant "denied that he had felt a weapon and admitted that he should not have searched [Plaintiff] lacking probable cause."  (*Id.*)

Defendant argues that he is nonetheless entitled to summary judgment because "the only reason the search is even remotely open for debate in terms of its constitutionality is because the officers choose to give the plaintiff 'a break' and not immediately arrest him."  (Def.'s Resp. Br. in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 44, PageID.918.)  As previously explained, Plaintiff's investigatory detention crossed the line to an arrest that required probable cause at the time he was handcuffed.  Because there is a genuine dispute of material fact as to whether Defendant had probable cause to believe Plaintiff was taking the truck unlawfully, there is likewise a genuine dispute of material fact as to whether Defendant's search was constitutional.  If Defendant did not have probable cause, then the search was unconstitutional because Defendant did not have reasonable suspicion to believe Plaintiff was armed or dangerous and Defendant

17

exceeded the bounds of a *Terry* frisk by reaching into Plaintiff's pocket. If, however, Defendant did have probable cause, then the search was a lawful search incident to arrest.

### 3. Excessive Force

"A seizure is 'unreasonable' under the Fourth Amendment if officers used excessive force." *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022)). "In deciding whether the force used was excessive, [the Court] balance[s] the government's interests in protecting others (including the police) and curbing crime against a suspect's right [] not to be injured." *Id.* (citing *Gambrel*, 25 F.4th at 400).

> Three factors are particularly relevant: (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether he [wa]s actively resisting arrest or attempting to evade arrest by flight.

*Id.* (internal citations and quotation marks omitted). "These factors are not an exhaustive list because the ultimate question is whether the totality of the circumstances justifie[d] [the] particular sort of seizure that took place." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022) (internal citations omitted). "An officer's use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' given the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). Plaintiff argues that Defendant used excessive force when he pushed him back into the vehicle while Officer Guthrie pulled him by the handcuffs.

In *Lockett v. Donnellon*, 38 F. App'x 289 (6th Cir. 2002), the defendant officers were dispatched to investigate reports of a domestic dispute. *Id.* at 290. The plaintiff refused to have his fingerprints and photograph taken, loudly protested his arrest, and repeatedly threatened legal

action.  *Id.* at 291.  While attempting to transport the plaintiff to jail, the officers allege that the

plaintiff "tried to pull away at least once" and "refused to bend his knees or otherwise cooperate

with being placed in the rear seat."  *Id.*  The plaintiff alleged that, after being punched and kneed

in the body, head, and chest, one of the officers went around to the other side of the patrol car,

opened the door, and grabbed his sweatpants to pull him into the car while another officer pushed

from the other direction.  *Id.*  The Sixth Circuit noted that "'[n]ot every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"

*Id.* at 292 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The court ultimately concluded

that "[a]lthough [the officers] pushed and pulled [the plaintiff] into the car in a rough manner, such

force was necessitated by [his] resistance and cannot be deemed excessive as a matter of law."  *Id.*

Similarly, here, Defendant's use of force to push Plaintiff into the patrol car was

reasonable.  As previously explained, Plaintiff refused to comply with Defendant's repeated verbal

commands to stay in the vehicle.  Plaintiff responded by saying he "want[ed] out" and that he

"knows his rights."  (Petersen Dash Camera 1:14:44-1:15:01.)  After he stepped out of the patrol

car against Defendant's commands, Plaintiff asserts that he "did not resist in any way" getting

back in.  (Putrich Aff., PageID.648.)  However, Defendant testified that he placed his hand on

Plaintiff's shoulder "and tried to push him down into the seat."  Plaintiff then "stiffened up and

resisted [him] doing that."  (Petersen Dep. 62.)  Defendant then instructed Officer Guthrie to go to

the driver's side passenger door, reach through, and grab ahold of Plaintiff's handcuffs to pull him

back into the patrol car.  Defendant placed a hand on top of Plaintiff's head, then on Defendant's

chest, and finally around Plaintiff's head to pull him down so Officer Guthrie, who was pulling

Plaintiff from the other side, could slide him into the patrol car.  (Guthrie Dash Camera 4:36-4:43.)

In light of *Lockett*, Plaintiff's verbal and physical refusal to follow commands renders Defendant's

use of force in pushing Plaintiff back into the patrol car reasonable.[12]  Defendant is entitled to summary judgment on the excessive force claim.

### B. Qualified Immunity

In this case, the question of qualified immunity depends on the resolution of disputed material facts as to the existence of probable cause to arrest Plaintiff for taking the truck unlawfully and to search him.  These questions of fact include whether, at the time of the arrest and search, Szpak had given Plaintiff permission to take the truck or whether she had revoked this permission.

Probable cause "turns on a practical assessment commonly made by 'reasonable and prudent' people, not a technical assessment reserved for 'legal technicians.'"  *United States v. Baker*, 976 F.3d 636, 645 (6th Cir. 2020) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)).  Accordingly, "'the probable cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.'"  *Id.* (quoting *Pringle*, 540 U.S. at 371).  Because of the fact-intensive nature of probable cause determinations, the Sixth Circuit has stated that "[w]here the reasonableness of an officer's actions hinge on disputed issues of fact, 'the jury becomes the final arbiter of . . . immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.'"  *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989); *see also Harris v. City of Saginaw*, Nos. 22-1504/1505, slip

---

[12] The parties dispute whether Defendant's push and Officer Guthrie's pull caused Plaintiff to do a summersault in the patrol car.  Plaintiff alleges that because of "the whiplash from that effect" he did "a backwards somersault all the way over and end[ed] up with [his] legs on the back side of Officer Guthrie and [his] head in his crotch."  (Putrich Dep. 36.)  Defendant alleges that Plaintiff "was just pulled into the vehicle" because "[i]t's virtually impossible to do a summersault when an officer has ahold of the handcuffs behind your back in any type of manner . . . . Whether I would have pulled his neck down or not, it is impossible to do a backward summersault when an officer has ahold of your handcuffs."  (Petersen Dep. 66.)  "'[T]he extent of the injury inflicted is not crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment.'"  *Williams v. Maurer*, 9 F.4th 416, 439 (6th Cir. 2021) (quoting *Coley v. Lucas Cnty.*, 799 F.3d 530, 539 (6th Cir. 2015)).  Whether Plaintiff did a summersault or not goes to the effect of Defendant's use of force, it is not a use of force in and of itself.  Accordingly, such a factual dispute does not preclude the Court from finding that Defendant's push of Plaintiff to get him in the patrol car was reasonable.

op. at 12 (6th Cir. Mar. 20, 2023) (finding that where genuine disputes of material fact remained as to whether a reasonable officer could have believed they had probable cause to arrest the plaintiff, qualified immunity is inappropriate and both parties' motions for summary judgment should be denied).  Because questions of fact remain as to probable cause, the reasonableness of Defendant's actions cannot be determined.  Consequently, the Court cannot decide the issue of qualified immunity at the summary judgment stage as it relates to the detention and search.

## IV. CONCLUSION

For the reasons stated above, the Court will grant summary judgment to Defendant on Plaintiff's excessive force claim, as well as the unlawful seizure claim as it relates to the arrest for resisting and obstructing a police officer.  However, there is a genuine dispute of material fact as to whether Plaintiff was unlawfully seized and searched prior to being arrested for resisting and obstructing a police officer.  Accordingly, the Court will deny summary judgment on these claims.  An order will enter consistent with this opinion.

Dated: March 22, 2023                                   /s/ Hala Y. Jarbou
                                                                    HALA Y. JARBOU
                                                                    CHIEF UNITED STATES DISTRICT JUDGE